## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* VERITY INVESTIGATIONS, LLC,<br><br>       *Plaintiff/Relator*,<br><br>   v.<br><br>AJINOMOTO CAMBROOKE, INC.<br><br>       *Defendant.* | Case No. _____<br><br>**ORIGINAL COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et seq.*<br><br>FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)<br><br>DO NOT PLACE IN PRESS BOX<br><br>Jury Trial Demanded** |

*QUI TAM* COMPLAINT

## I.  INTRODUCTION

1.     This is a *qui tam* case, filed on behalf of the federal government, seeking to recover nearly $1 million (plus mandatory trebling) that Defendant wrongfully obtained in the form of a federal guaranteed loan by falsely certifying that it was a small business concern. The loan was later forgiven, and the federal government paid the bill.

2.     The loan in question was provided by the Small Business Administration's ("SBA's") Paycheck Protection Program ("PPP"). The PPP was created by Congress near the start of the COVID-19 epidemic in the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") in 2020, and then received additional funding ($284 billion) in December 2020 in the "Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act." 15 U.S.C. § 636(a)(37).

3.     In April 2020, the SBA authorized a first series of PPP loans, which are known as "First Draw" PPP loans.

4.     In January 2021, SBA authorized a second series of PPP loans, widely referred to as "Second Draw" PPP loans.

5.     This case involves a false application for a First Draw PPP loan.

6.     The PPP loans were made available only to "small" businesses. The SBA established a clear, bright-line rule for who counted as "small."

7.     For First Draw PPP loans, applicants were required to certify that they (both the applicant and its affiliates) met the size standard—(a) collectively employed 500 or fewer persons, (b) met the SBA employee-based or revenue-based industry size standards, or (c) met the SBA alternative size standard that the maximum tangible net worth of the business is not more than $15

million and the average net income for two fiscal years before the date of the application is not more than $5 million.

8.      Defendant falsely certified to the SBA that it met the size standard for a small business. As a direct result of those false statements, Defendant obtained a First Draw PPP loan totaling $872,250, which was later forgiven in full.

9.      Relator is an outside investigative company that detected Defendant's fraud by reviewing Defendant's and its affiliates' consolidated financial statements. Those statements demonstrate that Defendant and its affiliates had tangible net worth and net income that far exceeds the $15 million and $5 million thresholds, respectively, and employed more than 500 employees during the relevant time period.

## II.     THE PARTIES

10.      Plaintiff Verity Investigations LLC ("Relator") is an investigative firm formed by two professionals with widespread experience in detecting and reporting fraud on the U.S. public fisc.

11.      Defendant Ajinomoto Cambrooke, Inc. is a Massachusetts corporation with its principal place of business in Ayer, Massachusetts.

## III.    JURISDICTION AND VENUE

12.      This action arises under the laws of the United States to redress violations of the Federal False Claims Act, 31 U.S.C. §§ 3729–33 ("FCA").

13.      Subject-matter jurisdiction is conferred by 28 U.S.C. §§ 1331, 1345.

14.      Venue is proper, and this Court has personal jurisdiction over Defendant, because Defendant is "found" in this District. 31 U.S.C. § 3732(a).

3

**IV.    THE FALSE CLAIMS ACT**

15.    The FCA is the primary civil remedial statute designed to deter fraud upon the United States. Its purpose is to "enhance the Government's ability to recover losses sustained as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (July 28, 1986).

16.    A defendant violates the FCA when the defendant "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

17.    Under the FCA, a claim includes a request for money. 31 U.S.C. § 3729(b)(2). A claim is "false or fraudulent" under the FCA if the entity or person submitting the claim was not entitled to payment.

18.    In 2009, Congress amended the FCA through the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21 (May 20, 2009), making a defendant liable under the FCA when the defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

19.    Under the FCA, the terms "knowing" and "knowingly" mean that the defendant "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

20.    No proof of specific intent to defraud the Government is required to show that a defendant acted knowingly under the FCA. 31 U.S.C. § 3729(b)(1)(B).

21.    The terms "knowing," "knowingly," "knowledge," "knows," and "knew," as used in this Complaint, have the meaning ascribed to them by the FCA.

22.    The FCA defines the term "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

4

23.     The FCA broadly defines a "claim" as "any request or demand . . . for money or property" that: "(i) is presented to an officer, employee, or agent of the United States," or "(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

24.     False statements made in a loan application to a third-party lender qualify as "false claims" to the government where, as here, the loan is guaranteed by the federal government and the federal government later repays the lender. *See United States v. Van Oosterhout*, 96 F.3d 1491, 1494 (D.C. Cir. 1996).

## V.     NO "PUBLIC DISCLOSURE" AND RELATOR IS AN ORIGINAL SOURCE

25.     On information and belief, no "public disclosure" has been made of Defendant's false statements and fraud detailed herein. 31 U.S.C. § 3730(e)(4)(A).

26.     On information and belief, Defendant's fraudulent transaction has not been publicly disclosed in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or by the news media.

27.     Even if there had been a "public disclosure," that would not matter in this case because Relator is an "original source of the information" set forth in this complaint. 31 U.S.C. § 3730(e)(4)(A).

28.     Relator's knowledge is independent of and materially adds to any publicly disclosed aspects of the fraudulent transactions described herein. Among other things, Relator has

"connected the dots" between (a) Defendant's consolidated financial statements, and (b) Defendant's false certifications for the First Draw PPP loan.

29.     Prior to filing this action, Relator voluntarily provided the Government with this complaint and all material evidence in Relator's possession relating to the fraudulent transactions.

## VI.    THE FIRST DRAW PPP LOAN PROGRAM

30.     To be eligible for a First Draw PPP loan, borrowers were required to meet one of the following criteria: "employs not more than the greater of" (1) "500 employees; or" (2) "if applicable, the size standard in number of employees established by the Administration for the industry in which the business concern, . . . operates," 15 U.S.C. § 636(a)(36)(D); or (3)  meets the "alternative size standard" as of March 27, 2020 with (a) "maximum tangible net worth of the applicant is not more than $15,000,000"; and (b) "the average net income after Federal income taxes (excluding any carry-over losses) of the applicant for the 2 full fiscal years before the date of the application is not more than $5,000,000." 15 U.S.C. § 632(a)(5).

31.     The SBA's website explained "who may qualify" for a First Draw PPP loan. This was explained in an overview page of the website[1] and in the online "Frequently Asked Questions" document available on the website.[2]

32.     The SBA's FAQ stated that "borrowers" were "required to apply SBA's affiliation rules under 13 C.F.R. 121.301(f)."[3]

33.     That regulation—13 C.F.R. § 121.301(f)—stated that when counting "employees," an applicant must include the employees of "all of its domestic and foreign affiliates." 13 C.F.R. § 121.301(f)(6).[4]

---

[1] SMALL BUSINESS ADMINISTRATION, First Draw PPP loan, https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/first-draw-ppp-loan.
[2] SMALL BUSINESS ADMINISTRATION, FAQ for PPP Borrowers and Lenders (as of April 29, 2020).
[3] SMALL BUSINESS and ADMINISTRATION, FAQ for PPP Borrowers Lenders at 2 (as of April 29, 2020).
[4] SMALL BUSINESS and ADMINISTRATION, FAQ for PPP Borrowers Lenders at 2 (as of April 29, 2020).

34.     That regulation defined affiliation broadly:

a.      Affiliation includes "affiliation based on ownership." "For determining affiliation based on equity ownership, a concern is an affiliate of an individual, concern, or entity that owns or has the power to control more than 50 percent of the concern's voting equity. If no individual, concern, or entity is found to control, SBA will deem the Board of Directors or President or Chief Executive Officer (CEO) (or other officers, managing members, or partners who control the management of the concern) to be in control of the concern. SBA will deem a minority shareholder to be in control, if that individual or entity has the ability, under the concern's charter, by-laws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders." *See* 13 C.F.R. § 121.301(f)(1).[5]

b.      Affiliation may also arise "under stock options, convertible securities, and agreements to merge." *See* 13 C.F.R. § 121.301(f)(2).[6]

c.      Affiliation may arise "based on management:" "Affiliation arises where the CEO or President of the applicant concern (or other officers, managing members, or partners who control the management of the concern) also controls the management of one or more other concerns. Affiliation also arises where a single individual, concern, or entity that controls the Board of Directors or management of one concern also controls the Board of Directors or management of one of more other concerns. Affiliation also arises where a single individual, concern or entity controls the management of the applicant concern through a management agreement." *See* 13 C.F.R. § 121.301(f)(3).[7]

---

[5] 13 C.F.R. § 121.301(f) (effective Mar. 27, 2020 to Sept. 7, 2021).
[6] 13 C.F.R. § 121.301(f) (effective Mar. 27, 2020 to Sept. 7, 2021).
[7] 13 C.F.R. § 121.301(f) (effective Mar. 27, 2020 to Sept. 7, 2021).

d. Affiliation may arise "based on identity of interest:" "Affiliation arises when there is an identity of interest between close relatives, as defined in 13 CFR 120.10, with identical or substantially identical business or economic interests (such as where the close relatives operate concerns in the same or similar industry in the same geographic area). Where SBA determines that interests should be aggregated, an individual or firm may rebut that determination with evidence showing that the interests deemed to be one are in fact separate." *See* 13 C.F.R. § 121.301(f)(4).[8]

e. Affiliation may arise "based on franchise and license agreements:" "The restraints imposed on a franchisee or licensee by its franchise or license agreement generally will not be considered in determining whether the franchisor or licensor is affiliated with an applicant franchisee or licensee provided the applicant franchisee or licensee has the right to profit from its efforts and bears the risk of loss commensurate with ownership. SBA will only consider the franchise or license agreements of the applicant concern." *See* 13 C.F.R. § 121.301(f)(5).[9]

35. On May 5, 2020, the SBA issued an FAQ response clarifying how "SBA's affiliation rules at 13 C.F.R. 121.301(f) apply with regard to counting the employees of foreign and U.S. affiliates." Specifically, the FAQ response clarified that "[f]or purposes of the PPP's 500 or fewer employee size standard, an applicant must count all of its employees and the employees of its U.S and foreign affiliates, absent a waiver of or an exception to the affiliation rules. 13 C.F.R. 121.301(f)(6)."[10]

36. The SBA required borrowers to submit a First Draw borrower application form (SBA Form 2483) to a federally insured bank or similar credit institution, which would process the loan application and fund the loan.

---

[8] 13 C.F.R. § 121.301(f) (effective Mar. 27, 2020 to Sept. 7, 2021).
[9] 13 C.F.R. § 121.301(f) (effective Mar. 27, 2020 to Sept. 7, 2021).
[10] SMALL BUSINESS ADMINISTRATION, Paycheck Protection Program Loans Frequently Asked Questions (FAQs) at 15 (as of May 5, 2020).

37.    The SBA Form 2483 required the borrower to state their "Number of Employees."

38.    The SBA Form 2483 then required the applicant's authorized representative to certify eligibility by signing a statement that "[t]he Applicant . . . employs no more than the greater of 500 or [*sic*] employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry."

39.    The SBA Form 2483 required the applicant's authorized representative to certify eligibility by signing a statement that "[t]he Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule)."

40.    The SBA Form 2483 also required the applicant's authorized representative to initial to "certify that the information provided in this application . . . is true and accurate," and to acknowledge "that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000 . . . ."

41.    The SBA guaranteed 100% of the outstanding balance of Defendant's First Draw PPP loan. The guarantee was backed by the full faith and credit of the United States. 15 U.S.C. § 636(a)(2)(F).

9

**VII.    DEFENDANT FALSELY CERTIFIED TO THE SBA THEIR COMPLIANCE WITH THE FIRST DRAW PPP LOAN SIZE REQUIREMENTS**

**A.    BACKGROUND: DEFENDANT AND NON-DEFENDANT ENTITIES ARE AFFILIATES**

**1.    DEFENDANT AJINOMOTO CAMBROOKE, INC.**

42.    Defendant Ajinomoto Cambrooke, Inc. ("Cambrooke") is a corporation registered in Massachusetts and headquartered at 4 Copeland Drive, Ayer, MA 01432.[11]

43.    Cambrooke can be validly served with process at 4 Copeland Drive, Ayer, MA 01432.[12]

44.    Cambrooke is a wholly owned subsidiary of Ajinomoto Co., Inc. ("Ajinomoto"), which is a publicly held Japanese company that has been in operation since 1908.[13]

45.    Ajinomoto Co., Inc. ("Ajinomoto"), a Japanese company, is the parent of companies in the Ajinomoto Group.  The Ajinomoto Group is a global conglomerate that handles the production of food and seasonings through the application of "AminoScience."[14]

46.    Cambrooke handles the development, manufacture, and sale of food formulas designed to fulfill a range of dietary needs.[15]

47.    Ajinomoto's Annual Report for 2020 indicates that Ajinomoto has 100% of the voting rights of Cambrooke.[16]

**2.    DEFENDANT'S AFFILIATES**

48.    The Ajinomoto Group has more than 50 businesses bases and 18 production bases in at least 27 countries worldwide, including the United States.[17]

---

[11] Cambrooke Website, https://www.cambrooke.com/about/contact/.
[12] Massachusetts Secretary of State, Identification Number 001375833.
[13] Ajinomoto Website, https://www.ajinomoto.com/aboutus/history.
[14] Ajinomoto Website, https://www.ajinomoto.com/aboutus.
[15] Cambrooke Website, https://www.cambrooke.com/about/.
[16] Ajinomoto 2020 Annual Report at 12 (English Translation).
[17] Ajinomoto Website, https://www.ajinomoto.com/aboutus/global_network.

49.     Ajinomoto's website identifies the following entities as its affiliates:[18]

a.  Ajinomoto Foods Nigeria Ltd.;
b.  Ajinomoto Do Brasil Industria E Comercio De Alimentos Ltda;
c.  Promasidor Holdings Limited;
d.  Kenney & Ross Limited;
e.  Sazonadores del Pacifico C. Ltda.;
f.  Ajinomoto de Mexico, S. de R.L. de C.V.;
g.  Ajinomoto del Peru S.A.;
h.  Ajinomoto Althea, Inc.;
i.  Ajinomoto Cambrooke, Inc.;
j.  Ajinomoto Fine-Techno USA Corporation;
k.  Ajinomoto Foods North America, Inc.;
l.  Ajinomoto Health & Nutrition North America, Inc.;
m.  Ajinomoto Toyo Frozen Noodles, Inc.;
n.  Forge Biologics Holdings, LLC;
o.  More Than Gourmet, Inc.;
p.  Ajinomoto Bangladesh Limited;
q.  Ajinomoto (Cambodia) Co., Ltd.;
r.  Ajinomoto (China) Co., Ltd.;
s.  Ajinomoto Shanghai Specialty Chemicals Co., Ltd.;
t.  Lianyungang Ajinomoto Frozen Foods Co., Ltd.;
u.  Lianyungang Ajinomoto Ruyi Foods, Co., Ltd.;
v.  Shanghai Ajinomoto Amino Acid Co., Ltd.;
w.  Shanghai Ajinomoto Food Research and Development Center Co., Ltd.;
x.  Shanghai Ajinomoto Seasoning Co., Ltd.;
y.  Shanghai Ajinomoto Trading Co., Ltd.;
z.  Xiamen Ajinomoto Life Ideal Foods Co., Ltd.;
aa.  Ajinomoto Bio-Pharma Services India Private Limited;
bb.  Ajinomoto India Private Limited;
cc.  Maruchan Ajinomoto India Private Limited;
dd.  PT Ajinex International;
ee.  PT Ajinomoto Indonesia;
ff.  PT Ajinomoto Sales Indonesia;
gg.  PT Lautan Ajinomoto Fine Ingredients;
hh.  Ajinomoto (Malaysia) Berhad;
ii.  Myanmar Ajinomoto Foods Co., Ltd.;
jj.  Ajinomoto Philippines Corporation;
kk.  Ajinomoto Philippines Flavor Food Inc.;

---

[18] Ajinomoto Website, https://www.ajinomoto.com/aboutus/global_network.

11

    ll.    Ajinomoto (Singapore) Pte. Ltd.;

    mm. Ajinomoto CELList Kora Co., Ind.;

    nn.   Ajinomoto Korea Inc.;

    oo.   Ajinomoto Nongshim Foods Co., Ltd.;

    pp.   Ajinomoto Taiwan Inc.;

    qq.   Taiso Commerce Inc.;

    rr.   Ajinomoto Betagro Frozen Foods (Thailand) Co., Ltd.;

    ss.   Ajinomoto Betagro Specialty Foods Co., Ltd.;

    tt.   Ajinomoto Co., (Thailand) Ltd.;

    uu.   Ajinomoto Frozen Foods (Thailand) Co., Ltd.;

    vv.   Ajinomoto Sales (Thailand) Co., Ltd.;

    ww. FD Green (Thailand) Co., Ltd.;

    xx.   Wan Thai Foods Industry Co., Ltd.;

    yy.   Ajinomoto Vietnam Co., Ltd.;

    zz.   S.A. Ajinomoto OmniChem N.V.;

    aaa. Ajinomoto Europe S.A.S.;

    bbb. Ajinomoto Foods Europe S.A.S.;

    ccc. Ajinomoto Frozen Foods France S.A.S.;

    ddd. Ajinomoto Jawo Sp. z o.o.;

    eee. Ajinomoto Poland Sp. z o.o.;

    fff.  OOO "Ajinomoto"

    ggg. AO "Ajinomoto-Genetika Research Institute"

    hhh. Agro2Agri, S.L.; and

    iii.   Ajinomoto Istanbul Food Industry and Trade Ltd.

50.    On information and belief, Defendant and the entities listed in ¶ 49, *supra*, qualify as "affiliates" for purposes of the PPP Loan program under one or more of the alternative definitions provided in 13 C.F.R. § 121.301(f).

**B.    AJINOMOTO CAMBROOKE, INC.'S FALSE STATEMENTS TO OBTAIN A FIRST DRAW PPP LOAN**

51.    In 2020, Cambrooke submitted a borrower application for a First Draw PPP loan.

52.    Cambrooke submitted its borrower application, SBA Form 2483, to Silicon Valley Bridge Bank in Santa Clara, California.

53.    In its SBA Form 2483, Cambrooke listed its address as 4 Copeland Drive, Ayer, MA 01432.

54.     In its SBA Form 2483, Cambrooke certified that it and its affiliates met the small business size standard by having (1) no more than 500 employees, (2) meeting the SBA industry size standards, or (3) meeting the SBA alternative size standard.

55.     Cambrooke is classified under NAICS code 325412 (Pharmaceutical Preparation Manufacturing). The SBA industry size standard for NAICS code 325412 is 1,250 employees. *See* 13 C.F.R. § 121.201.[19]

56.     In its SBA Form 2483, Cambrooke represented that it and its affiliates had 500 employees—under the 500-employee limit and 1,250-employee SBA industry size standard needed to be eligible to apply.

57.     Cambrooke's certification in SBA Form 2483 that it met the size standards for a First Draw PPP loan was false. Cambrooke and its affiliates had (1) far more than 1,250 employees in 2019 and 2020; (2) a maximum tangible net worth more than $15,000,000, *and* (3) more than $5,000,000 in average net income after Federal income for the 2 full fiscal years before the date of its application.

58.     Cambrooke deliberately ignored the fact that, together with its affiliates, it did not meet the SBA size standards for obtaining a First Draw PPP loan. Cambrooke signed its false SBA Form 2483 with knowledge of, or reckless disregard for, the truth.

59.     On or about May 18, 2020, Cambrooke was approved for a First Draw PPP loan in the amount of $872,250 by lender Silicon Valley Bridge Bank.

60.     The U.S. government paid lender Silicon Valley Bridge Bank a lender's processing fee of 3% of the $872,250 loan, in the amount of $26,168.[20]

---

[19] 13 C.F.R. § 121.201 (effective Nov. 20, 2019 to May 1, 2022).

[20] Paycheck Protection Program (PPP) Information Sheet: Lenders, https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf.

61.    On or about May 20, 2021, the U.S. government forgave 100% of Cambrooke's First Draw PPP loan, plus interest, in the amount of $881,045.19.

## C.    EVIDENCE OF MORE THAN 1,250 EMPLOYEES

62.    In its SBA Form 2483, a company must include "the employees of its domestic and foreign affiliates" in calculating its number of employees. *See* 13 C.F.R. § 121.106(b)(1).

63.    The 2020 annual financial report for Defendant's parent Ajinomoto indicates the companies in the Ajinomoto Group collectively had 34,504 employees in 2019. [21]

64.    The 2020 annual financial report for Defendant's parent Ajinomoto indicates the companies in the Ajinomoto Group collectively had 32,509 employees in 2020. [22]

65.    As of December 18, 2024, Ajinomoto's website touts that the Ajinomoto Group has 34,862 employees. [23]

66.    If Defendant had counted its affiliates' employees in its First Draw PPP loan application, Defendant would have reported far more than the 500-employee limit and the 1,250-employee SBA industry size standard.

67.    On information and belief, Defendant's and its affiliates' payroll records from 2019, 2020, and 2021 will confirm what Defendant always knew—that Defendant and its affiliates collectively employed well over 1,250 employees throughout the time period 2019–2021.

## D.    EVIDENCE OF NET WORTH AND NET INCOME GREATER THAN THE ALTERNATIVE SIZE STANDARD

68.    Defendant was not eligible for First Draw PPP loan under the SBA's alternative size standard. That standard required Defendant to show that it and its affiliates had both (1) tangible net worth of not more than $15 million, and (2) average net income of less than $5

---

[21] Ajinomoto 2020 Annual Report at 2 (English Translation).
[22] Ajinomoto 2020 Annual Report at 12 (English Translation).
[23] Ajinomoto Group, https://www.ajinomoto.com/aboutus/at_a_glance.

14

million for the two fiscal years before the date of Defendant's 2020 application for a First Draw PPP loan.

69.     As outlined below, as of March 27, 2020, Defendant and its affiliates had (1) a maximum tangible net worth of more than $15 million; *and* (2) average net income for the two full fiscal years before the date of the application more than $5 million. Defendant would not have been eligible if it failed either prong of the alternative size standard. Defendant failed both.

### 1.   TANGIBLE NET WORTH

70.     Defendant and its affiliates had a maximum tangible net worth of more than $15 million in FY2019 and FY2020. The 2020 annual financial report for Defendant's parent company Ajinomoto demonstrates a maximum tangible net worth of approximately **$2.9 billion** in FY2019 and **$2.2 billion** in FY2020—both far above the $15 million threshold:[24]

| Unit: JPY (Millions) | March 31, 2020 | March 31, 2019 |
|---|---|---|
| **Total Assets** | **1,353,616** | **1,393,869** |
| Less: Total Liabilities | (761,545) | (707,909) |
| **Net Worth** | **592,071** | **685,960** |
| Less: Intangible Assets | (69,245) | (66,132) |
| Less: Goodwill | (89,964) | (91,373) |
| Less: Investments Under Equity Method | (116,280) | (116,900) |
| Less: Long-term Financial Asset | (50,132) | (64,812) |
| Less: Deferred Tax Assets | (17,781) | (15,589) |
| Less: Other Non-current Assets | (16,952) | (24,523) |
| **Tangible Net Worth** | **231,717** | **306,631** |
| | | |
| Exchange Rate (1 JPY = USD)[25] | 0.0093698758 | 0.0093698758 |
| **Tangible net worth (USD)** | **$2,171,159,511** | **$2,873,094,368** |

---

[24] Ajinomoto 2020 Annual Report at 93-94 (English Translation).
[25] IRS Yearly Average Currency Exchange Rates, https://www.irs.gov/individuals/international-taxpayers/yearly-average-currency-exchange-rates (using 2020 average exchange rate).

15

71.    Thus, Defendant and its affiliates had a tangible net worth of over $15 million in each of the two years before the date of Defendant's 2020 PPP loan application.

### 2. AVERAGE NET INCOME

72.    On information and belief, Defendant's corporate group's average net income in 2018 and 2019 also far exceeded $5 million.

73.    Ajinomoto's 2020 annual financial report indicates that Defendant's corporate group had a net income of 39,004 million JPY between April 1, 2018 and March 31, 2019.[26] 39,004 million JPY converts to 365.47 million USD.[27]

74.    Ajinomoto's 2020 annual financial report indicates that Defendant's corporate group had a net income of 28,969 million JPY between April 1, 2019 and March 31, 2020.[28] 28,969 million JPY converts to 271.43 million USD. [29]

75.    This implies that the average net income for these two years was 318.45 million USD.  Given that this average net income is well beyond 5 million USD, Defendant could not have qualified for a First Draw PPP loan under the SBA's alternative size test.

76.    Given the tangible net worth and total comprehensive income of its affiliate Ajinomoto, Defendant could not have qualified for a First Draw PPP loan under the SBA's alternative size test.

---

[26] Ajinomoto 2020 Annual Report at 96 (English Translation).
[27] IRS Yearly Average Currency Exchange Rates, https://www.irs.gov/individuals/international-taxpayers/yearly-average-currency-exchange-rates (using 2020 average exchange rate).
[28] Ajinomoto 2020 Annual Report at 96 (English Translation).
[29] IRS Yearly Average Currency Exchange Rates, https://www.irs.gov/individuals/international-taxpayers/yearly-average-currency-exchange-rates (using 2020 average exchange rate).

## FIRST CAUSE OF ACTION

### Submitting False Claims for Payment
### 31 U.S.C. § 3729(a)(1)(A)

77.    Relator repeats, realleges, and incorporates the allegations set forth in the paragraphs above as though fully set forth herein.

78.    Defendant violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting and/or causing to be presented to the lender claims for approval of a First Draw PPP loan.

79.    Defendant's knowingly false claims in its SBA Form 2483 were material to the lender's decisions to issue the First Draw PPP loan and was material to the SBA's decisions to forgive that loan and repay the lender.

80.    But for Defendant's knowingly false claims, the lender would not have issued the loan, and the SBA would not have forgiven it.

81.    The PPP loan that Defendant obtained was money that was intended by the Government to be spent or used to advance the Government's program and interest in assisting qualified and eligible small businesses to survive the COVID-19 epidemic and to continue to employ their workers.

82.    The PPP loan that Defendant obtained was money that the Government effectively and in practice provided to the lender, by means of the Government's 100% guarantee to the lender of repayment by the Government in the case of default by the borrower.

83.    The Government later reimbursed the lender almost 100% of the amounts of Defendant's First Draw PPP loan, with interest.

17

**SECOND CAUSE OF ACTION**

**Creating a False Record or Statement Material to a False Claim**
**31 U.S.C. § 3729(a)(1)(B)**

84.    Relator repeats, realleges, and incorporates the allegations set forth in the paragraphs above as though fully set forth herein.

85.    Defendant violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making or causing to be made false records and statements—namely, its SBA Form 2483 and included certifications—to support false claims submitted to the lender for approval of a First Draw PPP loan.

86.    Defendant's knowingly false records and statements were material to the lender's decision to issue the First Draw PPP loan and were material to the SBA's decisions to forgive the loan and repay the lender.

87.    But for Defendant's knowingly false records and statements, the lender would not have issued the loan, and the SBA would not have forgiven it.

**PRAYER FOR RELIEF**

**WHEREFORE**, Relator requests judgment against Defendant for: (i) three times the amount of damages that the United States has sustained (including the full amount of the forgiven First Draw PPP loan and interest thereon, plus all processing fees paid by the Government); (ii) the maximum civil penalties allowed by law; (iii) an award to Relator for the maximum allowed under 31 U.S.C. § 3730(d); (iv) an award of attorney's fees, costs, and expenses; (v) interest as provided by law; and (vi) any other relief that this Court deems appropriate.

**<u>DEMAND FOR JURY TRIAL</u>**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Date: January 28, 2025                         Respectfully submitted,


                                               */s/ Raymond P. Ausrotas*
                                               Raymond P. Ausrotas (BBO #640315)
                                               **ARROWOOD LLP**
                                               10 Post Office Square, 7th Floor South
                                               Boston, MA  02109
                                               Telephone: (617) 849-6212
                                               RAusrotas@arrowoodllp.com

                                               Stephen Shackelford (*to seek pro hac vice*)
                                               Steven M. Shepard (*to seek pro hac vice*)
                                               **SUSMAN GODFREY L.L.P.**
                                               One Manhattan West, 50th Floor
                                               New York, NY 10001
                                               Telephone: (212) 336-8330
                                               Facsimile: (212) 336-8340
                                               sshackelford@susmangodfrey.com
                                               sshepard@susmangodfrey.com

                                               *Attorneys for Relator Verity Investigations, LLC*

19